**No. 2015-1504**

# United States Court of Appeals

*for the*

# Federal Circuit

TRIREME MEDICAL, LLC,

*Plaintiff-Appellant,*

– v. –

ANGIOSCORE, INC.,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA IN CASE NO. 3:14-CV-02946-LB
JUDGE LAUREL BEELER

## BRIEF FOR DEFENDANT-APPELLEE

PETER J. ARMENIO, P.C.
WILLIAM B. ADAMS
MATTHEW D. ROBSON
CLELAND B. WELTON II
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendant-Appellee
    AngioScore, Inc.*

July 13, 2015

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee certifies the following:

**1. The full name of every party or amicus represented by me is:**

AngioScore, Inc.

**2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Not applicable.

**3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

AngioScore, Inc. is a wholly owned subsidiary of The Spectranetics Corporation. No publicly held company owns 10 percent or more of The Spectranetics Corporation's stock.

**4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

QUINN EMANUEL URQUHART & SULLIVAN, LLP: William B. Adams, Peter J. Armenio, Aaron J. Bergstrom, Michelle A. Clark, Diane M. Doolittle, Matthew D. Robson, Charles K. Verhoeven, Cleland B. Welton II.

SHEPPARD MULLIN RICHTER & HAMPTON LLP: Andre De La Cruz, James W. Geriak

FARBER LLC: Mark Farber

Dated:  July 13, 2015

Respectfully submitted,

By: /s/ Peter J. Armenio

Peter J. Armenio, P.C.
William B. Adams
Matthew D. Robson
Cleland B. Welton II
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
peterarmenio@quinnemanuel.com

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ......................................................................v

STATEMENT OF RELATED CASES .......................................................ix

PRELIMINARY STATEMENT ................................................................1

COUNTERSTATEMENT OF THE ISSUES..............................................3

COUNTERSTATEMENT OF THE CASE...................................................3

    A.    AngioScore's Angioplasty Balloon Catheter Products And Patents...............................................................................................3

    B.    Lotan's Consulting Agreement Assigning All Inventive Contributions To AngioScore ..........................................................6

    C.    Lotan's Purported Inventive Contribution ............................................8

    D.    TriReme's Action Seeking To Add Lotan As An Inventor Of AngioScore's Patents ..........................................................................11

    E.    The District Court's Dismissal Of TriReme's Action For Lack Of Standing...................................................................................13

SUMMARY OF ARGUMENT ................................................................16

STANDARD OF REVIEW ......................................................................17

ARGUMENT ..........................................................................................18

I.    SECTION 9(b) OF THE CONSULTING AGREEMENT UNAMBIGUOUSLY ASSIGNS ANGIOSCORE ALL RIGHTS IN LOTAN'S PURPORTED INVENTIVE CONTRIBUTION .......................19

    A.    Lotan Contributed To The "Develop[ment]" And "Reduc[tion] To Practice" Of His Purported Inventive Contribution During The Term Of The Consulting Agreement ...........................................19

    B.    TriReme Cannot Overcome The Consulting Agreement's Plain Language ............................................................................................24

II.    TRIREME IS BOUND BY LOTAN'S REPRESENTATION IN SECTION 9(a) OF THE CONSULTING AGREEMENT THAT THERE ARE NO PRIOR INVENTIONS IN WHICH HE RETAINED AN INTEREST ......................................................................... 28

    A.    Lotan's Representation That He Had No Prior Inventions Is Conclusively Presumed To Be True Under California Law ............... 29

    B.    TriReme Cannot Avoid The Effect Of Lotan's Representation ......... 32

CONCLUSION ...................................................................................... 34

PROOF OF SERVICE ........................................................................... 36

CERTIFICATE OF COMPLIANCE ....................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AngioScore, Inc. v. TriReme Medical, Inc.*,
  No. 12-cv-3393 (N.D. Cal.) ............................................................ 11, 12

*Banner v. United States*,
  238 F.3d 1348 (Fed. Cir. 2001) ............................................................32

*Boston Scientific Corp. v. Johnson & Johnson*,
  550 F. Supp. 2d 1102 (N.D. Cal. 2008) ..............................................23

*Bunker Hill Park Ltd. v. U.S. Bank N.A.*,
  231 Cal. App. 4th 1315 (2014) ............................................................20

*California Bagel Co., 18 LLC v. Am. Bagel Co.*,
  2000 WL 35798199 (C.D. Cal. June 7, 2000) ....................................30

*Caterpillar Inc. v. Sturman Indus., Inc.*,
  387 F.3d 1358 (Fed. Cir. 2004) ..................................................... 27, 28

*Cedars-Sinai Med. Ctr. v. Watkins*,
  11 F.3d 1573 (Fed. Cir. 1993).............................................................17

*Chou v. Univ. of Chicago*,
  254 F.3d 1347 (Fed. Cir. 2001) ..........................................................18

*Cooper v. Goldfarb*,
  154 F.3d 1321 (Fed. Cir. 1998) ..........................................................23

*Cort v. St. Paul Fire & Marine Ins. Companies, Inc.*,
  311 F.3d 979 (9th Cir. 2002) ..............................................................26

*Estate of Yates*,
  25 Cal. App. 4th 511 (1994) ...............................................................30

*Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*,
  561 F.3d 1340 (Fed. Cir. 2009) ..........................................................29

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ............................................................21

*Fina Oil & Chem. Co. v. Ewen*,
   123 F.3d 1466 (Fed. Cir. 1997) ..........................................................................27

*F.T.C. v. Accusearch Inc.*,
   570 F.3d 1187 (10th Cir. 2009) .........................................................................21

*Hays v. Nat'l Elec. Contractors Ass'n, Inc.*,
   781 F.2d 1321 (9th Cir. 1985) ...........................................................................26

*IMATEC, Ltd. v. Apple Computer, Inc.*,
   15 F. App'x 887 (Fed. Cir. 2001) .....................................................................19

*Jafari v. F.D.I.C.*,
   2015 WL 3604443 (S.D. Cal. June 8, 2015)......................................................30

*Jim Arnold Corp. v. Hydrotech Sys., Inc.*,
   109 F.3d 1567 (Fed. Cir. 1997) .........................................................................19

*Larson v. Correct Craft, Inc.*,
   569 F.3d 1319 (Fed. Cir. 2009) .........................................................................18

*McGee v. Peake*,
   511 F.3d 1352 (Fed. Cir. 2008) .........................................................................21

*Mycogen Plant Sci. v. Monsanto Co.*,
   243 F.3d 1316 (Fed. Cir. 2001) .........................................................................23

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*,
   563 F.3d 777 (9th Cir. 2009) .............................................................................20

*In re Omeprazole Patent Litig.*,
   536 F.3d 1361 (Fed. Cir. 2008) .........................................................................23

*Park Terrace Ltd. v. Teasdale*,
   100 Cal. App. 4th 802 (2002) ...........................................................................30

*Perez v. 222 Sutter St. Partners*,
   222 Cal. App. 3d 938 (1990) ............................................................................30

*Plaza Freeway Ltd. P'ship v. First Mountain Bank*,
   81 Cal. App. 4th 616 (2000) ..................................................................... 29, 30

*Preston v. Marathon Oil Co.*,
    684 F.3d 1276 (Fed. Cir. 2012) ...........................................................19

*Rebolledo v. Tilly's, Inc.*,
    228 Cal. App. 4th 900 (2014) ..............................................................32

*Robinson v. United States*,
    586 F.3d 683 (9th Cir. 2009) ...............................................................18

*Scheenstra v. California Dairies, Inc.*,
    213 Cal. App. 4th 370 (2013) ..............................................................26

*Senju Pharm. Co. v. Apotex Inc.*,
    746 F.3d 1344 (Fed. Cir. 2014) ...........................................................31

*Solvay S.A. v. Honeywell Int'l, Inc.*,
    622 F.3d 1367 (Fed. Cir. 2010) ................................................... 22, 25

*Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*,
    711 F.2d 138 (9th Cir. 1983) ....................................................... 26, 27

*Swanson v. ALZA Corp.*,
    2013 WL 968275 (N.D. Cal. Mar. 12, 2013) ......................................28

*Tidewater Oil Co. v. Workers' Comp. Appeals Bd.*,
    67 Cal. App. 3d 950 (1977) ..................................................................30

*In re: TriReme Medical, LLC*,
    No. 15-128 (Fed. Cir. Apr. 2, 2015) ....................................................12

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)...............................................................................31

## Statutes and Rules

28 U.S.C. § 1338.........................................................................................19

35 U.S.C. § 256...........................................................................................18

CAL. CIV. CODE § 1641 ...............................................................................32

CAL. EVID. CODE § 622 .................................................................. 29, 30, 31

FED. R. EVID. 302.........................................................................................29

## <u>Other Authorities</u>

BLACK'S LAW DICTIONARY (10th ed. 2014) ............................................... 22, 23, 31

CORBIN ON CONTRACTS (Perillo ed.)........................................................................29

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2004) ............. 20, 21, 25

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ...............................21

WILLISTON ON CONTRACTS (4th ed.).........................................................................29

## <u>STATEMENT OF RELATED CASES</u>

No other appeal from this civil action was previously before this Court or any other appellate court.  No case pending in this Court or any other court will directly affect or be directly affected by this Court's decision in this appeal.

## PRELIMINARY STATEMENT

Plaintiff-Appellant TriReme Medical, LLC ("TriReme") seeks to prove its standing to bring this correction-of-inventorship action by rewriting the controlling provisions of the 2003 consulting agreement (the "Consulting Agreement") between TriReme's licensor, Dr. Chaim Lotan, and Defendant-Appellee AngioScore, Inc. ("AngioScore"). As the U.S. District Court for the Northern District of California (Beeler, M.J.) correctly ruled, however, section 9 of the Consulting Agreement contains two unambiguous provisions, each of which independently establishes that Lotan held no rights in the AngioScore patents-in-suit that he could have licensed to TriReme in 2014. Because TriReme cannot have obtained any rights from a licensor who held no rights himself, the Consulting Agreement conclusively establishes that TriReme lacks standing.

*First*, under section 9(b), Lotan assigned to AngioScore all "right, title and interest in and to all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets" that he "solely or jointly conceive[d] or develop[ed] or reduce[d] to practice during the term of th[e] Agreement." A310. This provision effected an assignment of Lotan's rights in his purported inventive contribution to the AngioScore patents-in-suit, because he admitted at deposition that, during the term of the Consulting Agreement, he designed, conducted, and interpreted the results of human clinical trials of

1

prototype devices that incorporated his putative contribution. Such trials were an integral component of demonstrating that the device was safe and effective for its intended purpose, and thus contributed to their "development" and their actual "reduction to practice" under the plain and unambiguous meaning of those terms. TriReme does not even attempt to define or construe this pivotal contract language, nor could it offer any reasonable interpretation under which Lotan's work during the Consulting Agreement's term would fall outside its scope. Lotan thus assigned any rights arising from his work to AngioScore in 2003, and had nothing to license to TriReme in 2014.

*Second*, under section 9(a), Lotan represented that there existed no "inventions, original works of authorship, developments, improvements, and trade secrets" that he had "made" prior to the Consulting Agreement and in which he retained an interest. A310. That representation is binding and conclusive under California law, which governs the Consulting Agreement, and it precludes Lotan and TriReme from taking the position that Lotan retained any licensable rights after 2003. TriReme's only answer to this provision is to assert that it does not exist, contending that section 9(a)'s only operative clause is a *separate* sentence allowing AngioScore to license intellectual property belonging to Lotan in certain circumstances. But that latter provision is not in issue here, and California law

prohibits TriReme's proposal to construe Lotan's representation as mere surplusage.

The unambiguous effect of the Consulting Agreement is that neither TriReme nor Lotan holds any right, title, or interest in the patents-in-suit or Lotan's purported inventive contribution thereto. TriReme thus has no standing to seek correction of inventorship, and the district court correctly dismissed the complaint for lack of subject matter jurisdiction. That judgment should be affirmed.

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether, pursuant to the unambiguous language of his Consulting Agreement, Lotan assigned to AngioScore "all right, title and interest in and to" his purported inventive contribution to the patents-in-suit, because he assisted in "develop[ing]" and "reduc[ing] to practice" that purported contribution during the term of the Consulting Agreement.

2.      Whether Lotan's representation in his Consulting Agreement that "there are no … Prior Inventions" precludes TriReme from establishing that Lotan retained rights in any inventive contribution he made prior to the date of the Consulting Agreement.

## COUNTERSTATEMENT OF THE CASE

### A.      AngioScore's Angioplasty Balloon Catheter Products And Patents

Over time, plaque can build up inside artery walls, both in coronary and peripheral arteries, clogging the passageways and restricting blood flow. This is a

dangerous condition, and AngioScore sells a line of patented medical devices used to treat this form of artery disease.  A3.  Each of these devices includes a balloon catheter with a non-deployable metal stent sitting on top of the balloon.  The idea is to insert the device (with the balloon deflated and the stent compressed) percutaneously and then to snake the catheter through the circulatory system until the balloon reaches the blockage (or "lesion").  The balloon is then inflated, pressing the balloon and the non-deployable metal stent (referred to as a "scoring element") into the accumulated plaque.  The metal of the stent pushes into ("scores") the plaque while the inflating balloon moves and compresses the blockage, widening the opening to something closer to its natural diameter.  The balloon is then deflated and the stent collapsed, and both are removed from the artery, allowing normal blood flow to resume.  *See generally* AngioScore: Peripheral Products, http://www.angioscore.com/perpheral-products.html (last visited July 8, 2015) (cited in A285-86); *see also* A4-5.  The process is depicted in this schematic diagram, which appears in each of the three AngioScore patents-in-suit (U.S. Patent No. 8,080,026, U.S. Patent No. 8,454,636, and U.S. Patent No. 8,721,667):



FIG. 1A



FIG. 1B



FIG. 1C

A61; A89; A116.

The patents-in-suit are directed at variations of this concept. Each is titled "Apparatus and Methods for Treating Hardened Vascular Lesions," and each lists the same three inventors—Eitan Konstantino, Tanhum Feld, and Nimrod Tzori. A57; A85; A112.

**B.    Lotan's    Consulting    Agreement    Assigning    All    Inventive Contributions To AngioScore**

Development of AngioScore's balloon catheter products began in 2002, when Dr. Eitan Konstantino conceived of the idea of improving then-existing balloon catheters by adding a scoring element.  A141.  In March 2003, Konstantino co-founded AngioScore (A141; A550), which focused on developing a scoring balloon catheter product (A141; A13).[1]

Lotan, an Israeli physician (A140-41; A346), played a minor role in the development of AngioScore's products (*see* A141-42; A348-50; A355-58; A370-71).  Lotan's relationship with AngioScore was governed by the Consulting Agreement (A309-15), which he executed in November 2003 (A312) and under which he agreed to provide AngioScore with "Services"—a term defined as "advi[ce] … on product design, clinical trial design and interpretation of clinical data," as well as "assist[ance] … with preclinical and clinical testing of the Company's products at mutually agreed upon times and places" (A309; A313). The Consulting Agreement had an effective date of May 1, 2003, and its term continued until "the completion of [Lotan's] Services."  A309.

The Consulting Agreement, which provides that its "validity, interpretation, construction and performance … shall be governed by the laws of the State of

---

[1]    Konstantino later co-founded TriReme and served as its CEO.

6

California" (A311), contains two substantive provisions pertinent to this appeal.

Section 9(b), titled "Assignment of Inventions," provides:

> Consultant agrees to promptly disclose to the Company and hereby assigns to the Company, or its designee, all right, title and interest in and to all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable, that Consultant may solely or jointly conceive or develop or reduce to practice during the term of this Agreement that relate to the Services (collectively referred to as "Inventions").

A310. Section 9(a), titled "Inventions Retained and Licensed," provides:

> Consultant has attached hereto, as part of Exhibit C, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by Consultant prior to the date of this Agreement (collectively referred to as "Prior Inventions"), that belong solely to Consultant or belong to Consultant jointly with another and that relate to any of the Company's current or proposed businesses, products or research and development; or *if no such list is attached, Consultant represents that there are no such Prior Inventions.*

> If, in the course of providing the Services, Consultant incorporates into a Company product, process or machine or into any Invention (as defined below), a Prior Invention owned by Consultant or in which Consultant has an interest, the Company is hereby granted and shall have a non-exclusive royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Prior Invention as part of or in connection with such product, process, machine or Invention.

A310 (emphasis and paragraph break added). The referenced "Exhibit C" bears

Lotan's signature, but does not list any "Prior Inventions" (A315), because, as

Lotan explained in deposition, he did not believe that he had invented anything at

that time (A349-52).

7

The effect of section 9, taken together with the blank Exhibit C, is twofold. *First*, pursuant to subsection (b), Lotan assigned to AngioScore "all right, title and interest in and to all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets" that he might (on his own, or together with others) "conceive," "develop," or "reduce to practice" on or after May 1, 2003. A310. *Second*, pursuant to subsection (a), because Lotan did not attach a list of "inventions, original works of authorship, developments, improvements, and trade secrets" that he made before May 1, 2003, he "represent[ed] that there are no such Prior Inventions." *Id.*

### C.     Lotan's Purported Inventive Contribution

TriReme describes (Br. 9-11) Lotan's alleged "inventive contribution" to AngioScore's patents-in-suit as the idea that, for the scoring balloon catheter device to work safely, the metal scoring element "needs to have both sides secured" to the catheter body, while remaining "flexible" enough to allow the balloon to inflate and deflate properly. *See* A358; A142. If not so "secured," TriReme asserts that the metal wires could fall off of the device during removal, lodging in the patient's circulatory system with disastrous results. *See id.*

Lotan testified in deposition that he conceived of the idea of flexibly but securely attaching the wires to the catheter in or around April 2003, when he performed a single-day animal study of AngioScore's in-development catheter

8

product.  A339-40; A349; A353; A355; A414-18.  Both Konstantino and his co-inventor Feld observed the study, which involved inserting prototypes of AngioScore's devices into a pig's arteries, inflating and deflating them as they would be used in a human subject, and then retracting them.  A414-18.  Although these tests were performed with prototypes of AngioScore's innovative scoring balloon catheter design, Lotan testified that he was already familiar with the practice of balloon-catheter angioplasty; "most of" what he used for the test was known to him from his work on earlier animal studies on different devices.  A357.

Lotan tested five prototypes, four of which encountered problems when the metal scoring element detached from the balloon.  A415-16; A349-50.  As Lotan acknowledged in his deposition, this problem was obvious:  the detachment was easily observable "with the naked eye" and did not require "any special tools or training" to detect or analyze.  A350; A355-56.  Similarly, Lotan admitted that he did not need special insight to determine that the device could not be considered safe if it risked leaving the scoring wires behind upon removal, as "anybody watching [the] study" "could have concluded" that the scoring element "needed to stay attached to the catheter" for the device to succeed.  A371.

Following this single-day, five-sample study, Dr. Lotan joined with others in the production of a five-page memorandum summarizing the study.  A414-18.  The memorandum concluded that "there is a clear retention problem," that "the current

bonding method is clearly inadequate," and that better bonding of the scoring element was "essential." A418. Shortly thereafter, Lotan allegedly discussed the problem and a proposed solution with AngioScore, and allegedly suggested that the scoring element be secured with the help of a "semicompliant tube." A359; *see* A349-50; A141-42.

Lotan testified that, after running the pig study in April 2003, he continued to provide consulting services relating to AngioScore's ongoing development of its scoring balloon catheter product. Specifically, in the summer and "towards the end of 2003," he was "busy with some clinical work" for AngioScore. A339; A353. This work, he testified, included "design[ing] some clinical trials to use the AngioScore balloon in … bifurcated lesions in arterial stenosis [patients] … and in patients with hard calcified lesions." A348. And, Lotan testified, he not only designed these trials—which involved human subjects (A348) and prototypes including the "semicompliant tube" that he had allegedly suggested as a solution to the "retention problem" (A366; *see* A418)—he also conducted some of the trials himself, by "[e]nrolling patients" and personally "doing the procedure[s]" (A366; *see also* A353; A15). And when the tests were complete, Lotan contributed to AngioScore's "interpretation of [the] clinical data." A348; *see also* A6; A14-15; A39 (TriReme's counsel stating that "the only thing Dr. Lotan testified doing during the term of the agreement … is the clinical studies"); TriReme Br. 31

(acknowledging that Lotan "talk[ed] with AngioScore," "plann[ed] human studies," "conduct[ed] studies," and "help[ed] to interpret the clinical data" after May 1, 2003).   All of this work helped develop AngioScore's scoring balloon catheter device, and Lotan was paid for it under the Consulting Agreement.   *See* A309; A353.

### D.    TriReme's Action Seeking To Add Lotan As An Inventor Of AngioScore's Patents

Lotan testified that his relationship with AngioScore soured over the following decade (A337-38), and in an agreement "entered into and made effective as of June 24, 2014," Lotan granted AngioScore's competitor, TriReme, "a royalty-free, exclusive worldwide license" to "all legal and equitable rights" he allegedly held in the patents-in-suit (A317-23), in exchange for $80,000 (A361). TriReme filed this action in the Northern District of California the next day. A139-45.[2]

---

[2]    At the time TriReme filed this action, the parties were engaged in a separate lawsuit in the Northern District of California.   *See AngioScore, Inc. v. TriReme Medical, Inc.*, No. 12-cv-3393 (N.D. Cal.) (Gonzalez Rogers, J.).   In that case, AngioScore alleges, *inter alia*, that TriReme has infringed another AngioScore patent related to specialty balloon catheters, and that Konstantino (aided and abetted by TriReme and others) breached his fiduciary duties to AngioScore by failing to disclose and assign to AngioScore certain intellectual property—which he then used to develop a competing product at TriReme.

On the same day TriReme filed its complaint in this action, the district court in *AngioScore* substantially denied TriReme's motion for summary judgment and granted AngioScore's motion to amend its complaint to allege the breach-of-

The complaint alleges that through testing performed in April 2003, Lotan "determined that there were several flaws in the design of [AngioScore's] prototypes" (A141), and "recommended changes to attachment of the scoring structure to account for forces observed during the testing … that caused the original prototypes to fail" (A142). While admitting that Lotan's purported contributions "were not included in [AngioScore's] original [July 30, 2003] patent application," Trireme alleges that they were added to later applications and were ultimately included in the patents-in-suit. *Id*.[3]

---

fiduciary-duty claims. *Id.*, ECF 218, 219 (June 25, 2014). This Court subsequently denied TriReme's petition for a writ of mandamus, *In re: TriReme Medical, LLC*, No. 15-128, ECF 18 (Fed. Cir. Apr. 2, 2015) (Wallach, J., joined by Prost, C.J. & Reyna, J.), and the matter proceeded to a bench trial on the breach-of-fiduciary duty claims in April 2015. On July 1, 2015, the district court issued a 110-page order in which it ruled in AngioScore's favor "in all material respects." *AngioScore*, No. 12-cv-3393, ECF 665, at 2. The district court found (*inter alia*) that Konstantino breached his fiduciary duties to AngioScore and that TriReme and another co-defendant had aided and abetted those breaches (*id.* at 12-41). The district court ordered Konstantino to disgorge all benefits he received from the breaches, awarded AngioScore its past and future lost profits (totaling more than $20 million), and held TriReme jointly and severally liable for AngioScore's injuries. *Id.* at 56-63.

The district court has scheduled a jury trial on AngioScore's patent claims for September 2015.

[3] While not necessary for the district court's standing analysis, or needed for this Court to affirm, TriReme admits in its complaint (A141-42) that Lotan did *not* contribute to AngioScore's U.S. Patent Application Serial No. 10/631,499, filed July 30, 2003. This application resulted in U.S. Patent No. 7,686,824 (A556-76), which discloses, without contribution from Lotan, attaching the scoring element to the catheter with axially extensible structures, and explains that "[s]ince

On this basis, TriReme alleged that Lotan was "erroneously omitted as an inventor" of the patents-in-suit.  A143-44.  The complaint does not refer to the Consulting Agreement, nor does it acknowledge the testing and other consulting work that Lotan performed after May 1, 2003.

### E.    The District Court's Dismissal Of TriReme's Action For Lack Of Standing

The district court ordered a two-stage proceeding designed to allow AngioScore to make an early motion to dismiss for lack of subject-matter jurisdiction.  A220-22.  Following the first round of discovery, AngioScore moved to dismiss the complaint pursuant to Rule 12(b)(1), arguing (*inter alia*) that TriReme lacked Article III standing because Lotan had assigned any rights he may have had in his purported inventive contribution to AngioScore via the Consulting Agreement and thus had nothing to license to TriReme a decade later.  The district court agreed, and, in an order entered March 17, 2015, granted the motion on two independent grounds.[4]

*First*, the district court ruled that "[e]ven if [Lotan's] work was complete before May 1, 2003," Lotan's representation "that there were no earlier inventions

---

the scoring cage is fixed to the catheter, any risk of loss or slippage from the balloon is reduced while sufficient compliance is provided to easily accommodate radial expansion of the intermediate scoring section" (A574 (col. 11, lines 13-24)).

[4]  TriReme and AngioScore consented to proceed before Magistrate Judge Beeler for all purposes.  A173-75.

in which he was retaining an interest" precluded TriReme from obtaining standing as his licensee.  A8; *see also, e.g.*, A9 ("Even if … Lotan completed his work by May 1, 2003, he still represented that there were no 'Prior Inventions[]' in which he was 'retain[ing] an interest.'"); A11 ("[B]ecause he did not list any … inventions on Exhibit C, Dr. Lotan represented that there were none.").  Lotan therefore "had nothing to license to TriReme in 2014."  A9.

The district court rejected TriReme's attempt to avoid this conclusion by arguing that section 9(a) merely granted AngioScore a non-exclusive license in some of Lotan's work.  A10-11.  Although the second sentence of that provision does provide for a license in certain circumstances (A310; *see supra*, at 7), the district court explained that only the first sentence, which required identification of Prior Inventions in which Lotan wished to retain rights, is relevant here.  A10-11; A8.  The district court again concluded that "because he did not list any such inventions on Exhibit C, Dr. Lotan represented that there were none."  A11.

*Second*, the district court ruled that the same result would hold, even "apart from any consideration of the 'Prior Inventions' exclusion [of section 9(a)], under the main assignment clause [of section 9(b)]."  A14.  Observing that section 9(b) applied to intellectual property that Lotan "develop[ed] or reduce[d] to practice during the term of th[e] agreement," the district court ruled that Lotan's work on the catheter after May 1, 2003 constituted such "development" and "reduction to

14

practice." A14-15.  His consulting work comprised "plann[ing]," "design[ing]," "conduct[ing]," and "interpret[ing]" human clinical trials—"exactly the sort of work that his consulting agreement anticipates." *Id.*; *see also* A5-6.  The district court thus ruled that "under the plain meaning of section 9(b)'s terms, [this work] amounted to 'developing,' 'improving,' or 'reducing to practice' the 'recommendations' that Dr. Lotan made in April 2003 for improving the prototype catheter." A15.

So while the district court assumed that the alleged *inventive contribution* "was complete by April 2003" in the sense that Lotan did no further *design* work after he made his recommendation (*id.*), the district court explained that this assumption did not matter:  Lotan triggered section 9(b) by continuing his work to develop his purported inventive contribution and to reduce it to practice *after* May 1, 2003.  *Id.*  Similarly, the district court stated that it "[did] not need to consider … when an idea penciled into a recommendation becomes an inventive idea," because regardless of when Lotan finished *conceiving* his idea, he continued working to develop and reduce it to practice during the term of the Consulting Agreement.  *Id.*[5]

---

[5]    The district court also rejected TriReme's bid to postpone the jurisdictional question until trial, concluding that the disputed issues relating to standing are not "intertwined" with the merits of the case.  A11.  "To the contrary," there was no need to address the details of TriReme's substantive inventorship

The district court entered final judgment dismissing the complaint on March 31, 2015.  A1.

## SUMMARY OF ARGUMENT

The district court correctly ruled that TriReme lacks standing to bring this correction-of-inventorship action because Lotan, its licensor, relinquished any rights he allegedly had in the patents-in-suit by entering into the Consulting Agreement with AngioScore in 2003.  Lotan thus had nothing to convey to TriReme in their 2014 license agreement.

*First*, in section 9(b) of the Consulting Agreement, Lotan assigned to AngioScore all right, title, and interest in and to any invention, development, or improvement that he solely or jointly "develop[ed]" or "reduce[d] to practice" during the Consulting Agreement's term.  Lotan testified (and TriReme admits) that he designed, conducted, and interpreted the results of human clinical studies of devices incorporating his purported inventive contribution during that term.  Under the plain meaning of the Consulting Agreement's language, that work constituted "joint[] … develop[ment]" of the purported inventive contribution, because it contributed to making the device usable and commercially viable.  And it constituted actual "joint[] … reduc[tion] to practice" of the purported inventive

---

contentions, because "[t]he jurisdictional decision here requires little more than a straightforward reading of the consulting agreement in light of the most preliminary facts." *Id.*

contribution, because it contributed to demonstrating that the device is effective for its intended purpose. The Consulting Agreement therefore unambiguously provides that Lotan assigned his purported inventive contribution to AngioScore in 2003, and accordingly the 2014 license agreement could not have conferred standing upon TriReme.

*Second*, because Lotan did not provide a list of inventions, developments, and/or improvements in which he would retain an interest after the Consulting Agreement's execution, Lotan represented under section 9(a) of the agreement that no such inventions, developments, or improvements existed. Under governing California law, that representation is binding on both Lotan and TriReme, and is conclusively presumed to be true. TriReme cannot overcome this conclusive presumption, and it therefore cannot show that Lotan retained a licensable interest in his purported inventive contribution after 2003.

## STANDARD OF REVIEW

Applying regional circuit law (here that of the Ninth Circuit), this Court reviews the district court's dismissal of a complaint pursuant to Rule 12(b)(1) *de novo* and its underlying findings of fact for clear error. *See, e.g.*, *Cedars-Sinai*

*Med. Ctr. v. Watkins*, 11 F.3d 1573, 1580, 1583 (Fed. Cir. 1993) (applying Ninth Circuit law); *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009).[6]

## ARGUMENT

To establish standing in an action seeking correction of inventorship pursuant to 35 U.S.C. § 256, a plaintiff must ordinarily demonstrate at least a "'concrete financial interest' in the patent[]," such that a change in the patent's named inventors would remedy an alleged injury-in-fact. *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009); *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1358-59 (Fed. Cir. 2001).[7] While a plaintiff can acquire such an interest through a license or other similar agreement (rather than outright ownership), *see Chou*, 254 F.3d at 1359, the purported licensor must hold rights in the patent in order to convey them to someone else.[8]

---

[6]   Because AngioScore's Rule 12(b)(1) motion controverted TriReme's jurisdictional allegations, the district court was not required to accept the complaint's allegations as true, and it properly considered the parties' exhibits, affidavits, and Lotan's deposition testimony. *See, e.g.*, *Cedars-Sinai*, 11 F.3d at 1584; *Robinson*, 586 F.3d at 685.

[7]   While this Court has suggested that a "reputational" (rather than financial) interest might be enough to support standing for an allegedly omitted co-inventor in an inventorship action, *see Larson*, 569 F.3d at 1327; *Chou*, 254 F.3d at 1359, TriReme, as a corporate plaintiff with no relationship to Lotan other than the 2014 license agreement, does not claim that it has any such interest in appending Lotan's name to the patents-in-suit.

[8]   As the district court explained (A15-17), this Court has repeatedly held that once the owner of intellectual property assigns away its rights, it no longer has

Here, the district court correctly ruled that Lotan had assigned whatever rights he may have had in his purported inventive contribution to AngioScore in 2003, that Lotan thus held no rights that he could have licensed to TriReme in 2014, and that TriReme accordingly has no standing to seek correction of inventorship for the patents-in-suit. A14-15. Its judgment should be affirmed.

## I.    SECTION 9(b) OF THE CONSULTING AGREEMENT UNAMBIGUOUSLY ASSIGNS ANGIOSCORE ALL RIGHTS IN LOTAN'S PURPORTED INVENTIVE CONTRIBUTION

### A.    Lotan Contributed To The "Develop[ment]" And "Reduc[tion] To Practice" Of His Purported Inventive Contribution During The Term Of The Consulting Agreement

Section 9(b) of the Consulting Agreement states that Lotan assigned to AngioScore "all right, title and interest in and to all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets,

---

an interest that can support standing in a dispute arising out of those rights. *See, e.g.*, *Larson*, 569 F.3d at 1326-27 (Larson lacked standing because he "affirmatively transferred title to the patents" and therefore had "no financial interest in the patents sufficient for him to have standing to pursue a § 256 claim"); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1571-72 (Fed. Cir. 1997) ("To invoke the jurisdiction of a federal court under § 1338, it is necessary that plaintiff … demonstrate that he, and not the defendant, owns the patent rights on which the infringement suit is premised."); *IMATEC, Ltd. v. Apple Computer, Inc.*, 15 F. App'x 887, 890, 895-96 (Fed. Cir. 2001) (unpubl.) (plaintiff lacked standing because he had assigned his rights to his former employer); *cf. Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1288 (Fed. Cir. 2012) (plaintiff had assigned his patents to defendant pursuant to an employment agreement similar to the Consulting Agreement). While TriReme attempts (Br. 35-42) to distinguish this case from those precedents, as explained below the terms of the Consulting Agreement here compel the same result.

whether or not patentable," that he "solely or jointly conceive[d] or develop[ed] or reduce[d] to practice" during the term of the agreement.  A310.  TriReme does not deny that Lotan's purported inventive contribution—his alleged suggestion that the scoring element should be secured to the catheter so that it would not detach during removal (*see supra*, at 8-11)—falls within the broad categories of intellectual property covered by section 9(b), and offers (Br. 31-32) only the barest of argument that Lotan did not "conceive or develop or reduce to practice" that contribution on or after May 1, 2003.  As the district court correctly concluded (A14-15), Lotan's post-May 1 work on the balloon catheter falls squarely within the ordinary meanings of both "development" and "reduction to practice."

*First*, Lotan participated in "developing" the catheter product during the term of the agreement.  That term's dictionary definition includes (as relevant here) "to work out the possibilities of," "to make available or usable," and, in the analogous context of developing real (rather than intellectual) property, "to make suitable for commercial … purposes."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 341 (11th ed. 2004).[9]  As the Tenth Circuit explained in a case turning

---

[9]    Under California law, it is appropriate to consult dictionaries in determining the plain or ordinary meaning of contractual language.  *See, e.g.*, *Bunker Hill Park Ltd. v. U.S. Bank N.A.*, 231 Cal. App. 4th 1315, 1327 (2014) (court "may appropriately refer" to "definitions … contained in legal and lay dictionaries … when attempting to ascertain the ordinary meaning of a word"); *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 563 F.3d 777, 784 n.4 (9th Cir.

on the meaning of "develop" under the Communications Decency Act: "The word *develop* derives from the Old French *desveloper*, which means, in essence, to unwrap"; its definitions accordingly "revolve around the act of drawing something out, making it 'visible,' 'active,' or 'usable.'" *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1198 (10th Cir. 2009) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 618 (2002)); *accord Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (en banc) ("develop" means, *inter alia*, "making usable or available") (quoting WEBSTER'S, *supra*, at 618).

Lotan's admitted, ongoing work on AngioScore's catheter products after May 1, 2003 constitutes "development" under the agreement's plain language as reflected in these definitions. By "design[ing] some clinical trials" (A348), "doing the procedure[s]" with prototypes incorporating the "semicompliant tube" (A366), and then "interpret[ing] [the] clinical data" (A348; *see also* A6; A14-15; A39), Lotan participated in "work[ing] out the possibilities of" the scoring balloon catheter product, as well as making it "available," "usable," and "suitable for commercial purposes." MERRIAM-WEBSTER'S, *supra*, at 341; *see also Fair Hous.*

_____

2009) (under California law, "dictionary definitions are an appropriate consideration in evaluating the ordinary meaning of terms in [a] contract"); *see also McGee v. Peake*, 511 F.3d 1352, 1356 (Fed. Cir. 2008) ("ordinary meaning may be properly informed by the use of dictionaries").

*Council*, 521 F.3d at 1168; *Accusearch Inc.*, 570 F.3d at 1198.  Indeed, TriReme concedes (Br. 31) that Lotan's "work was directed at shepherding the invention through the various obstacles that must be surmounted to obtain regulatory approval."  Obtaining such approval was central to "work[ing] out" the device's "possibilities," as well as to making it "usable," "available," and "suitable for commercial purposes."  Thus, by working to test AngioScore's prototype product after May 1, 2003, Lotan participated in developing the product during the term of the Consulting Agreement—meaning that he assigned his rights to AngioScore under section 9(b) of the agreement.

*Second*, Lotan also helped "reduce to practice" his purported inventive contribution during the term of the Consulting Agreement.  The dictionary definition of that legal term of art encompasses "empirical demonstration that an invention performs its intended purpose," *i.e.*, "the use of an idea or invention—*as by testing it*—to establish that the idea or invention will perform its intended purpose."  BLACK'S LAW DICTIONARY 1469 (10th ed. 2014) (emphasis added).  Thus, as this Court has explained, "[a]ctual reduction to practice requires that the claimed invention work for its intended purpose," *Solvay S.A. v. Honeywell Int'l*,

*Inc.*, 622 F.3d 1367, 1376 (Fed. Cir. 2010), proof of which "may require testing," *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998).[10]

By designing, conducting, and interpreting the results of human clinical trials on a device that included his purportedly novel "bonding" concept (embodied in the "semicompliant tube") during the Consulting Agreement's term, Lotan "test[ed]" the scoring catheter product and thereby "demonstrat[ed]" that the device "perform[s] its intended purpose." BLACK'S, *supra*, at 1469; *see also, e.g.*, *Solvay*, 622 F.3d at 1376; *In re Omeprazole*, 536 F.3d at 1373. That is, he participated in reducing the idea to practice during the term of the Consulting Agreement. Section 9(b) therefore provides that Lotan assigned to AngioScore his rights in his purported inventive contribution for this reason as well.[11]

---

[10]    *See also, e.g.*, *In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1373 (Fed. Cir. 2008) ("Testing is required to demonstrate reduction to practice in some instances because without such testing there cannot be sufficient certainty that the invention will work for its intended purpose."); *Boston Scientific Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1113 (N.D. Cal. 2008) (testing required to establish reduction to practice of balloon catheter device); *cf. Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1332 (Fed. Cir. 2001) ("[W]hen testing is necessary to establish utility, there must be recognition and appreciation that the tests were successful for reduction to practice to occur.").

[11]    It does not matter that Lotan did not work alone in developing the product and reducing it to practice, because the Consulting Agreement provides for assignment of intellectual property that Lotan "solely *or jointly* … develop[ed] or reduce[d] to practice during the term of th[e] Agreement." A310 (emphasis added). Nor does it matter that Lotan may have "conceive[d]" of his alleged

### B.    TriReme Cannot Overcome The Consulting Agreement's Plain Language

TriReme devotes (Br. 31-32) only two paragraphs in response to this plain-language interpretation of section 9(b).  Its arguments are unsupported and ultimately self-defeating.

*First*, rather than confront the Consulting Agreement's plain language, TriReme repeatedly paraphrases the specific, unambiguous terms "develop" and "reduce to practice" with the vague word "arising" (*e.g.*, Br. 14, 29, 34), which appears nowhere in the agreement.  And when TriReme does briefly address the Consulting Agreement's pivotal terms, it merely *asserts* that "'talking' with AngioScore and 'plann[ing] on human studies,' … conducting studies, and helping to interpret the clinical data does not rise to the level of conceiving, developing, or reducing the invention to practice" (Br. 31 (citing A348, A353, A366))—citing no authority and offering no definition of "developing" or "reducing to practice" under which that assertion could be true.  Indeed, as discussed (*see supra*, at 20-23), TriReme admits (Br. 31) that Lotan's work under the Consulting Agreement included clinical trials (a component of actual reduction to practice), and that those trials were "directed at shepherding the invention through the various obstacles that

---

"inventive contribution" before May 1, 2003 (*see id.*; TriReme Br. 30-31), because he worked to "develop" it and to "reduce [it] to practice" after that date.

must be surmounted to obtain regulatory approval" (an important step in developing the device).

*Second*, TriReme suggests (Br. 31-32 (quoting A15)) that Lotan's work amounted only to "collecting regulatory data on a finished device," wrongly implying that such data-collection would not fall within the scope of the assignment effected by section 9(b). As shown above, neither "development" nor "reduction to practice" ceased upon completion of the product's design. Instead, both continued into the term of the Consulting Agreement, until the product was shown to "work for its intended purpose," *Solvay*, 622 F.3d at 1376, and thus to be "suitable for commercial purposes," MERRIAM-WEBSTER'S, *supra*, at 341. *See* A348; A353; A366; A39.

The fact that the catheter "turned out" to "work[] '[q]uite nicely'" (TriReme Br. 32 (quoting A366)) does not help TriReme: If the testing had failed, or if it had never been conducted, the product never would have been fully developed or reduced to practice. Although Lotan's trials were successful, they were still part of the process of developing the product and reducing it to practice, because they helped to establish that the device worked safely and could be commercialized.

*Finally*, there is no merit to AngioScore's assertion (Br. 32 (quoting A310)) that there is an "issue of fact" as to "whether Dr. Lotan's post-April 2003 work amounted to 'conceive[ing] or develop[ing] or reduce[ing] to practice during the

term of this Agreement.'"  There are *no* material disputes (*contra* TriReme Br. 33) about "[w]hat Lotan did" (he designed, conducted, and analyzed human clinical trials) or "when he did it" (after May 1, 2003).  And "AngioScore presented ***no evidence***" of its own (Br. 32) because Lotan's own deposition testimony was dispositive (*see supra*, at 10-11, 13-15).  Nor does TriReme contend that there is anything ambiguous about the terms "develop" and "reduce to practice."  The only issue therefore is how that contractual language applies to the undisputed facts, which is a question *of law*.  *See, e.g.*, *Scheenstra v. California Dairies, Inc.*, 213 Cal. App. 4th 370, 391 (2013) ("[T]he interpretation of [a] contract and its application to undisputed facts are questions of law…."); *Cort v. St. Paul Fire & Marine Ins. Companies, Inc.*, 311 F.3d 979, 982 (9th Cir. 2002) ("The interpretation of [a contract], as applied to undisputed facts, is a question of law."); *Hays v. Nat'l Elec. Contractors Ass'n, Inc.*, 781 F.2d 1321, 1323 (9th Cir. 1985) ("The legal effect of an unambiguous and undisputed contract provision … is a question of law….").

TriReme is likewise mistaken to suggest (Br. 32 (quoting *Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*, 711 F.2d 138, 139 (9th Cir. 1983)) that "the question of jurisdiction is dependent on the resolution of factual issues going to the merits."  *See* A11 (district court rejecting this argument).  The merits of this dispute concern whether Lotan made such a significant contribution to

AngioScore's patents-in-suit that he is entitled to be named a co-inventor of those patents. *See, e.g.*, *Caterpillar Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1377 (Fed. Cir. 2004) (joint inventor "must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention") (quoting *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997)). In contrast, the jurisdictional question presented on this appeal *assumes arguendo* that Lotan made a cognizable inventive contribution and asks only whether he assisted in "developing" or "reducing to practice" that contribution during the term of the Consulting Agreement.[12]   He did, and TriReme therefore has no standing to sue.[13]

---

[12]   As described above (*see supra*, at 8-10), Lotan's purported "inventive contribution" amounted to observing that the prototype's scoring element repeatedly detached from the catheter while in use, and suggesting that AngioScore do something to attach it more securely.  AngioScore assumes solely for purposes of this appeal that Lotan's contribution would be sufficient to justify correction of inventorship, but would submit on the merits that Lotan's putative "contribution" falls far short of qualifying him as a joint inventor.  *See, e.g.*, *Caterpillar*, 387 F.3d at 1377 (proof of joint inventorship "requires more than merely exercising ordinary skill in the art").

[13]   This case is thus unlike *Sun Valley*, in which subject-matter jurisdiction and the substantive claim for relief turned on the same issue—whether the plaintiff and the defendant were in a "franchise relationship" for purposes of the Petroleum Marketing Practices Act.  *See* 711 F.2d at 139.  Here, jurisdiction turns on the timing of certain events and the meaning of a contract, whereas the merits would turn on the separate question whether Lotan's purported inventive contribution is significant enough to entitle TriReme to relief.

## II.   TRIREME IS BOUND BY LOTAN'S REPRESENTATION IN SECTION 9(a) OF THE CONSULTING AGREEMENT THAT THERE ARE NO PRIOR INVENTIONS IN WHICH HE RETAINED AN INTEREST

Independent of the assignment accomplished by section 9(b) of the Consulting Agreement, TriReme's assertion of standing also fails because, upon executing the agreement, Lotan disclaimed *any* ownership interest in *any* relevant intellectual property.  Specifically, by not attaching, "as part of Exhibit C [to the Consulting Agreement], a list" identifying any "Prior Inventions" (defined to include not only standalone "inventions" but also "developments" and "improvements"), Lotan "represent[ed] that there are no such Prior Inventions." A310.  That is, Lotan represented that as of the date of the agreement, he owned no rights in any purported "development" or "improvement" of AngioScore's prototype—a category that covers any "inventive contribution" on which TriReme could base an inventorship claim.  *See Caterpillar*, 387 F.3d at 1377 (joint inventor's contribution to invention must be "not insignificant in quality, when … measured against the dimension of the full invention").  That representation is binding against both Lotan and TriReme under governing California law, and

---

This case is also unlike *Swanson v. ALZA Corp.*, 2013 WL 968275, *5 (N.D. Cal. Mar. 12, 2013) (cited in Br. 33), because (as shown in text) there are no "factual disputes" concerning the Consulting Agreement's meaning or the facts to which that agreement must be applied.

consequently TriReme cannot claim to have acquired any rights by taking a license from Lotan.

### A. Lotan's Representation That He Had No Prior Inventions Is Conclusively Presumed To Be True Under California Law

California has "codified" the common-law doctrine of "estoppel by contract," *Plaza Freeway Ltd. P'ship v. First Mountain Bank*, 81 Cal. App. 4th 616, 619 (2000), providing by statute that "[t]he facts recited in a written instrument are ***conclusively presumed to be true*** as between the parties thereto, or their successors in interest." CAL. EVID. CODE § 622 (emphasis added). This statute provides a rule of contract construction by specifying the legal effect of a contractual representation,[14] and that rule is fully applicable here. *See* A311 (Consulting Agreement elects California law); *Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*, 561 F.3d 1340, 1343 (Fed. Cir. 2009) ("Construction of patent assignment agreements is a matter of state contract law.").[15] Specifically,

---

[14] *Cf.* 11 WILLISTON ON CONTRACTS § 30:1 (4th ed.) ("'Construction[]' … involves the court determining … the legal meaning of the entire contract…. [I]nterpretation involves ascertaining the meaning of contractual words while construction involves deciding their legal effect."); 5 CORBIN ON CONTRACTS § 24.3 (Perillo ed.) ("Through 'construction' of a contract, a court determines the legal operation of the contract—its effect upon the rights and duties of the parties.").

[15] Since Section 622 establishes a presumption applicable to the dispositive question of state contract law at issue here, Federal Rule of Evidence 302 would call for its application even if the Consulting Agreement itself did not. *See* FED. R. EVID. 302 ("In a civil case, state law governs the effect of a presumption regarding

under Section 622, it is ***conclusively presumed*** that there are ***no*** Prior Inventions in which Lotan retained any interest after April 2003.  *See, e.g.*, *Park Terrace Ltd. v. Teasdale*, 100 Cal. App. 4th 802, 806 (2002) (applying conclusive presumption as to "the truth of the provision in each note that a licensed real estate person 'arranged' the obligation"); *Plaza Freeway*, 81 Cal. App. 4th at 621-29 (tenant bound under Section 622 by representations in estoppel certificate delivered pursuant to lease).[16]

Although TriReme is not a party to the Consulting Agreement, Section 622 binds it to Lotan's representation as the "successor[] in interest" to his intellectual-property rights.  Under California law, "'successor in interest' has been broadly defined to mean '[o]ne who follows another in ownership *or* control of property.'" *Estate of Yates*, 25 Cal. App. 4th 511, 522 (1994) (quoting *Perez v. 222 Sutter St. Partners*, 222 Cal. App. 3d 938, 948 n.8 (1990)) (emphasis added); *see also Tidewater Oil Co. v. Workers' Comp. Appeals Bd.*, 67 Cal. App. 3d 950, 959 (1977) (California "courts have interpreted the term 'successor in interest' in a

---

a claim or defense for which state law supplies the rule of decision."); *see also, e.g.*, *Jafari v. F.D.I.C.*, 2015 WL 3604443, *7 (S.D. Cal. June 8, 2015) (citing FED. R. EVID. 302 and applying Section 622 to construction of California-law instrument); *California Bagel Co., 18 LLC v. Am. Bagel Co.*, 2000 WL 35798199, *1, *9 & n.67 (C.D. Cal. June 7, 2000) (same).

[16]  Section 622 does not apply to "the recital of a consideration," CAL. EVID. CODE § 622, but Lotan's representation that he owned no relevant intellectual property is not such a recital.

broad sense rather than in a narrow and technical sense"); *accord* BLACK'S, *supra*, at 1660 (same definition as in *Yates*).   TriReme is Lotan's "successor in interest" because it holds an "*exclusive* worldwide license" covering "all legal and equitable rights held by Lotan, now or in the future" in and to his purported inventive contribution and any patent rights deriving therefrom.   A317-18.   Indeed, as TriReme itself explains (Br. 13 (citing A497-98; A537)), Lotan "retains no financial interest in the Patents-in-Suit and has no stake—monetary or non-monetary—in the present litigation."

Accordingly, Section 622 binds TriReme to Lotan's contractual representation that, as of May 1, 2003, he had no interest in any relevant "invention[], … development[], or improvement[]" relating to AngioScore's business.   TriReme therefore cannot show that Lotan retained any interest in his purported inventive contribution that he could have licensed to TriReme in 2014.[17]

---

[17]   While the district court did not rely on Section 622, much of its analysis reflects the common-sense principle that a purported licensee cannot have obtained an interest in property when the purported licensor certified more than a decade earlier that no such property existed. *See supra*, at 13-14.   In any event, this Court "sit[s] to review judgments, not opinions," *Senju Pharm. Co. v. Apotex Inc.*, 746 F.3d 1344, 1353 (Fed. Cir. 2014), and "may affirm the district court on a ground not selected by the district judge so long as the record fairly supports such an alternative disposition," *Banner v. United States*, 238 F.3d 1348, 1355 (Fed. Cir. 2001) (citation omitted); *cf. Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) (once a "claim is properly presented, a party can make any argument [to an appellate court] in support of that claim; parties are not limited to the precise arguments they made below").

### B.     TriReme Cannot Avoid The Effect Of Lotan's Representation

TriReme's remaining arguments do not defeat the conclusive presumption that Lotan had no rights to license after 2003.

*First*, TriReme's contention (Br. 21) that "Paragraph 9(a) simply operates to grant AngioScore a license" to certain inventions, and "does not do anything else," would leave the first half of that subsection, pursuant to which a failure to list any Prior Inventions constitutes a representation that none existed, with no purpose or effect.  California law prohibits such an interpretation.  *E.g.*, CAL. CIV. CODE § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part…."); *Rebolledo v. Tilly's, Inc.*, 228 Cal. App. 4th 900, 923 (2014) ("contracts 'are construed to avoid rendering terms surplusage'").[18]

*Second*, while TriReme is correct that the Consulting Agreement *itself* does not "express[] any forfeiture" (Br. 28), or "state that Consultant … *loses* any rights to inventions that are not listed" (Br. 21), it ignores that the contractual language and California law are clear in dictating that Lotan's failure to identify any Prior Inventions constitutes a binding representation that he owned *no* relevant intellectual property as of May 1, 2003 (or, by implication, in 2014).

---

[18]     TriReme misplaces reliance (Br. 21-22) on the *expresio unius* canon, which does not apply here since the operative representation is clear and express. And TriReme's extended recitation of contract-law truisms (Br. 24-27) is untethered to the facts of this case.

*Third*, TriReme's assertion (Br. 29; *see also* Br. 23) that Section 9(a) does not provide for "automatic assignment" upon failure to list any Prior Inventions attacks a strawman. The district court did not rule, and AngioScore has never argued, that section 9(a) is an *assignment* provision. Instead, as shown, the first sentence of that section sets out the conditions under which Lotan could retain particular rights, while providing AngioScore with assurance (through the representation provision) that Lotan could not conceal a putative "invention" and then return years later claiming rights in AngioScore's products. It is this *representation* provision that is dispositive.

*Fourth*, there is no support for TriReme's argument (Br. 23) that the "only reasonable interpretation" of the word "retained" in section 9's heading "is that Dr. Lotan retained his prior inventions whether listed or unlisted." Instead, the representation clause explicitly provides that Lotan's failure to identify any Prior Inventions constitutes a binding representation that none existed. TriReme concedes that it is the "operative language of the paragraph" that controls (*id.*), and it is that language which, by operation of California law, precludes TriReme from claiming that Lotan had any pre-May 1, 2003 interests relevant here.[19]

---

[19]    TriReme's suggestion (Br. 28) of an "inconsistency" between the Consulting Agreement's section 9(a) and its Exhibit C is misplaced. Under section 9(a), Lotan represented that no Prior Inventions existed *unless* he attached a list of such inventions "as part of" the Exhibit. A310. Lotan attached no such list, and

*Finally*, contrary to AngioScore's suggestion (Br. 29-30), there is nothing ambiguous in the relevant portions of the Consulting Agreement:  Section 9(a) is clear in providing that failure to list any Prior Inventions constitutes a representation that none existed, and California law is clear in deeming that representation binding.  Thus, the only possible "ambiguity" that TriReme can even purport to identify (Br. 30) is in the word "retained" in the section heading.  But even if that word were ambiguous (it is not), that would have no effect on the *unambiguous* operative language in section 9(a)'s text.

TriReme has no standing to pursue its correction-of-inventorship claims.

## <u>CONCLUSION</u>

The judgment should be affirmed.

---

thus he represented that no Prior Inventions existed, regardless of whether he also checked the box on Exhibit C for "No inventions or improvements."

Dated:  July 13, 2015                    Respectfully submitted,

                                         /s/ Peter J. Armenio
                                         Peter J. Armenio, P.C.
                                         William B. Adams
                                         Matthew D. Robson
                                         Cleland B. Welton II
                                         QUINN EMANUEL URQUHART
                                            & SULLIVAN, LLP
                                         51 Madison Avenue, 22nd Floor
                                         New York, NY 10010
                                         Telephone: (212) 849-7000
                                         Facsimile: (212) 849-7100
                                         peterarmenio@quinnemanuel.com

                                         *Attorneys for Defendant-Appellee*

## **<u>PROOF OF SERVICE</u>**

The undersigned hereby certifies that on July 13, 2015, I caused the foregoing BRIEF FOR DEFENDANT-APPELLEE to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Peter J. Armenio
Peter J. Armenio, P.C.
*Attorney for Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel for Defendant-Appellee hereby certifies that:

1.     The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because exclusive of the exempted portions it contains 8,006 words as counted by the word processing program used to prepare the brief; and

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2013 in a proportionately spaced typeface:  Times New Roman, font size 14.


Dated:  July 13, 2015                    /s/ Peter J. Armenio
                                         Peter J. Armenio, P.C.
                                         *Attorney for Defendant-Appellee*